## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD ANTON DOERING, III,** | : | **Civil No. 1:20-cv-01969** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,[1]** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.   Introduction

The Supreme Court has recently underscored for us the limited scope of our

review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on
July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure and 42 U.S.C. § 405(g), Kilolo Kijakazi is substituted for Andrew
Saul as the defendant in this suit.

e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case, the plaintiff, Richard Anton Doering III applied for supplemental security income under Title XVI of the Social Security Act on July 29, 2018, alleging disability due to disc protrusion and foraminal stenosis, cervical stenosis of the spine, severe chronic cervical and lumbar spine disease, lumbar radicular pain, cervical lumbar degenerative disc disease, nerve root compression, arachnoiditis, cervicalgia, peripheral neuropathy, and thoracic outlet syndrome. (Tr. 194). However, after consideration of the medical records and opinion evidence, including the objective diagnostic tests and clinical findings on Doering's physical and mental examinations, Doering's longitudinal treatment history, and his documented activities of daily living, the Administrative Law Judge ("ALJ") who reviewed this case concluded that Doering could perform a limited range of sedentary work and denied his disability application.

Mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'"

Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   **Statement of Facts and of the Case**

On July 29, 2018, Richard Anton Doering III applied for applied for disability and supplemental security insurance benefits, citing an array of physical and emotional impairments, including disc protrusion and foraminal stenosis, cervical stenosis of the spine, severe chronic cervical and lumbar spine disease, lumbar radicular pain, cervical lumbar degenerative disc disease, nerve root compression, arachnoiditis, cervicalgia, peripheral neuropathy, and thoracic outlet syndrome. (Tr. 194). Doering was 40 years old at the time of the alleged onset of his disability and had prior employment as a grocery stock and register clerk, a sales and customer service representative, a nurse's assistant, and a solutions and formulations tech. (Tr. 24, 172).

With respect to these alleged impairments the clinical record, medical opinions, and the plaintiff's activities of daily living revealed the following: Doering has a long history of asthma, though he has never been hospitalized for it. (Tr. 236). He also has back and neck pain from a motor vehicle accident in 2007. (Tr. 180).

3

In September 2016, the plaintiff's neurosurgeon Arnold Salotto, M.D., noted an MRI of Doering's cervical spine showed spondylosis and disc degeneration with foraminal narrowing at C5-C6 and at C6-C7. (Tr. 451). His lumbar spine MRI indicated bilateral foraminal stenosis at L4-L5, and right sided foraminal narrowing at L5-S1. (Id.) Dr. Salotto suggested possible surgery for ACDF at C5-C6 and C6-C7 as well as bilateral foraminotomies at L4-L5 and on the right at L5-S1 with consideration of fusion at L4-L5. (Id.) Dr. Salotto examined Doering and noted an antalgic gait assisted with a cane and lumbar tenderness to palpation. (Tr. 450). Otherwise, he had negative straight leg raising, intact cranial nerves, equal motor strength, and symmetric sensation and reflexes. (Id.) Dr. Salotto filled out a medical source statement in October of 2016. (Tr. 454-58). This statement indicated that Doering was significantly limited in his ability to lift or carry things; to stand, walk, or sit; and to climb, balance, kneel, crouch, crawl, or stoop. (Id.)

In September 2017, Doering complained of joint pain, cramps, muscle spasms of the hands, feet, and legs, leg pain with walking, difficulty concentrating and insomnia due to pain. (Tr. 272). Still, a physical exam indicated he was generally healthy. His cranial nerves were within normal limits and his muscle strength in his upper and lower extremities were normal. (Tr. 273). He had mild tightening of handgrip with handwriting of the low right hand, but otherwise no obvious hand

4

spasm or dystonic movement. (Id.) His reflexes, gait, station, and coordination were all normal. (Id.)

In January 2018, Doering followed up with Adrian Chan, M.D., and reported his symptoms had improved since his last visit. (Tr. 291). He had less body spams and cramping and Baclofen was helping. (Id.) He said he still had neck and back pain, but water therapy was helping and denied any clear triggers to his pain. (Id.) Dr. Chan was unsure of the cause of his muscle cramps and spasms and ordered an EMG of his legs, which showed possible chronic left L4 or L3 radiculopathy, possible chronic right L5 radiculopathy, but no evidence for length dependent peripheral neuropathy. (Tr. 295, 297).

At a follow-up appointment with Deborah Bernal, M.D., in August 2018, Doering reported that aqua therapy, breathing exercises, and stretches were helping. (Tr. 301). Still, he reported falling a few times due to his legs but had declined injections. (Id.) Dr. Bernal noted Doering had gluteus medius ilipsoas weakness, "fixed dropped" sacroiliac joint movement on lumbosacral pelvic motion, taut bands in his iliopsoas, used his upper extremities and cane for transfers, and had balance abnormalities bilaterally. (Tr. 302). Dr. Bernal recommended continuing conservative treatment. (Tr. 303). She also prescribed him a TENS unit. (Id.)

Doering followed up with Dr. Salotto in September 2018. (Tr. 695). Dr. Salotto reviewed the 2016 MRI of Doering's lumbar spine, noted he did not see any changes requiring surgery, and recommended conservative measures. (Id.) Dr. Salotto noted Doering had antalgic gait, was assisted with a cane, had decreased sensation to pinprick in the left thigh and both lower extremities, absent reflexes in his ankle and knees, and a decreased range of motion of his back. (Tr. 699). Otherwise, his motor strength was equal, and cranial nerves were intact. (Id.)

In October 2018, Doering followed up with his primary care physician, Kristina Nivus, D.O. (Tr. 741). Treatment notes indicate that he complained that Amitriptyline was making him tired. (Id.) He still had back pain, numbness and tingling in his legs, but less twitching and spasms while on the drug. (Id.) His physical examination indicated no acute distress or deficits in his extremities or back. (Tr. 742). Dr. Nivus continued him on Amitriptyline. (Tr. 741).

Doering underwent a consultative medical examination in December 2018 with Ahmed Kneifati, M.D. (Tr. 317-30). Dr. Kneifati noted Doering's history of asthma and degenerative disc disease. (Tr. 317). Doering complained of constant and sharp back pain radiating to both legs with numbness. (Id.) The pain was worse with sitting, bending, lifting, walking distances, changes in temperature and humidity. (Id.) He also reported constant and sharp neck pain associated with

headaches and numbness of his hands. (Id.) He was taking Lyrica and Baclofen for his pain. (Id.) Dr. Kneifati indicated that Doering showered and dressed daily, watched television, and socialized with a friend. (Tr. 318). Dr. Kneifati further noted that Doering was in no acute distress, but his gait was antalgic on the left and had a positive straight leg raise in the supine position. (Tr. 318-19). Doering walked with a significant limp to the left without a cane. (Tr. 318). He diagnosed Doering with asthma, degenerative disc disease of the cervical spine with foraminal narrowing, radicular pain, and lumbar pain with depression disorder and narrowing of foramen with radicular pain, noting that his prognosis was "fair." (Tr. 320).

At a January 2019 follow-up with Dr. Nivus, Doering reported improvement in his fatigue with continued use of Amitriptyline. (Tr. 736).  However, he also described persistent numbness and tingling in his hands, feet, arms and legs. (Id.) Dr. Nivus observed he was in pain and arching his back occasionally during the examination, but was awake, and alert and had no deficits in his back, extremities, or gait. (Tr. 737). Dr. Nivus increased his dose of Amitriptyline. (Tr. 736).

Doering followed up with Dr. Bernal in January 2019 and complained of twitching pain in his body. (Tr. 587). He indicated that Amitriptyline helps him sleep but makes him groggy. (Id.) He reported doing his exercises regularly, breathing, and Kegel's three times a day, and stretches with aquatics in the pool five days per

week. (Id.) Dr. Bernal's physical exam was unchanged except that she did not note him to be using a cane. (Id.) She again recommended conservative measures. (Tr. 586).

He followed up with Dr. Salotto in September 2019. (Tr. 700). Dr. Salotto discussed options of surgery versus epidural steroid injections, but Doering was not interested in injections. (Id.) On physical examination, Doering had a positive bilateral straight leg raising test, mildly weak strength in dorsiflexion bilaterally, hypoactive reflexes as his knees and ankles, his gait was antalgic with assistance of a cane, and he had decreased range of motion of his lumbar spine. (Tr. 701, 704-05). However, his sensation as symmetric, his cranial nerves were intact, and he had no tenderness to palpation of his lumbar spine. (Id.) Dr. Salotto ordered an MRI of the lumbar spine. (Tr. 701).

Later that month, Dr. Salotto noted that Doering's 2019 lumbar spine MRI showed several levels of deterioration, most prominent at L4-L5 where he had more significant disc collapse and foraminal stenosis bilaterally, worse on the right. (Tr. 706, 719-20). He noted Doering had degenerative changes at adjacent levels as well. (Id.) There were no changes that required surgery, although Dr. Salotto believed it remained a reasonable option, but Doering declined and inquired about conservative treatments such as chiropractic therapy. (Tr. 706). Doering still had antalgic gait

assisted with a cane, positive bilateral straight leg raising bilaterally, relatively decreased sensation in the right lower leg, and hypoactive reflexes at his knees and ankles. (Tr. 707, 710-11). However, he had equal motor strength, intact cranial nerves, no lumbar tenderness to palpation, and there were no notes of decreased lumbar range of motion. (Id.)

Doering also followed up with Dr. Bernal in September 2019, at which time he complained of everything getting worse. (Tr. 728). Dr. Bernal's physical exam showed tenderness, taut bands, crepitation in range of motion, and described Doering's gait as "gluteus medius." (Tr. 729). Dr. Bernal recommended continuing with conservative measures. (Tr. 730).

Doering testified about his activities of daily living. He lived with his fiancé and two children, ages 3-years-old and 6-months old. (Tr. 35). His fiancé works from 6:00 am to 2:30 pm, and he is home alone with the children during that time. (Tr. 36). He makes his children breakfast and changes and feeds the baby. (Id.) In between these tasks, he lies down, reads a book to them, or does a puzzle. (Tr. 36-37). Doering stated that he had lower back issues since at least July of 2018, which caused his legs to go numb at times. (Tr. 37-38). He testified that he got spasms in his back, his feet were constantly numb, and he had to use walls and furniture for stability when walking. (Tr. 38-39).

It is against the backdrop of this evidence that the ALJ conducted a hearing in Doering's case on November 18, 2019. Doering and a vocational expert ("VE") both testified at this hearing. Following this hearing on November 18, 2019, the ALJ issued a decision denying Doering's application for benefits. (Tr. 25).

In that decision, the ALJ first concluded that Doering had not engaged in substantial gainful activity since July 29, 2018, his application date. (Tr. 14). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Doering had the following severe impairments: degenerative disc disease of the lumbar, thoracic, and cervical spine, thoracic outlet syndrome, and asthma. (Id.) At Step 3 the ALJ determined that Doering did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). (Id.)

Between Steps 3 and 4 the ALJ concluded that Doering retained the following residual functional capacity:

> [Doering] has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except he can never climb ladders, ropes, or scaffolds, and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He must avoid concentrated exposure to extreme cold, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards.

(Tr. 15).

10

In reaching this RFC determination, the ALJ made the following findings: Doering's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 16).

In making this determination, the ALJ considered the medical evidence as outlined above as well as opinion evidence. On this score, the ALJ found that the opinion of a state agency consultant, Dr. Park, M.D., was somewhat persuasive. (Tr. 20). Dr. Park opined that Doering was capable of performing a range of light work with additional postural limitations, including that Doering could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand or walk for 6 hours in an 8-hour day; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (Tr. 62-63). The ALJ found that this opinion was supported by references to the objective medical records and were generally consistent with the record as a whole. (Tr. 21). The ALJ noted that Doering's physical examinations varied, with Dr. Nivus noting no deficits in terms of his back, extremities, or gait, and with Dr. Salotto's exams appearing extreme given the fact that Dr. Salotto opined that surgery was not required. (Id.)

The ALJ also considered Dr. Salotto's opinions from 2016, 2017, and 2019, and found these opinions unpersuasive. (Tr. 23). The ALJ first noted that the 2016 and 2017 opinions were outside the relevant time period. (Id.) Further, the ALJ reasoned that the rational for the November 2019 opinion was not consistent with the record. (Id.) On this score, the ALJ noted that Dr. Salotto consistently recommended conservative treatments and opined that surgery was not required. (Id.) The ALJ further stated that portions of Dr. Salotto's opinion were inconsistent with his own treatment notes and the objective MRI findings. (Id.)

Finally, the ALJ considered the opinion of the consulting examiner, Dr. Kneifati, and found this opinion somewhat persuasive because this opinion was more consistent with the record as a whole. (Id.) The ALJ found that Dr. Kneifati's findings were in between the extremes of Dr. Nivus and Dr. Salotto. (Tr. 21). However, the ALJ noted that he was further limiting Doering to sedentary work rather than light work due to the MRI findings regarding Doering's lower back pain. (Tr. 22).

The ALJ then found that Doering had no past relevant work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. (Tr. 25). Having reached these conclusions, the ALJ determined that

12

Doering had not met the demanding showing necessary to sustain his claim for benefits and denied this claim.  (Tr. 26).

This appeal followed. (Doc. 1). On appeal, Doering challenges the adequacy of the ALJ's decision arguing that the ALJ failed to find persuasive the opinion of Arnold Salotto, M.D. and incorrectly concluded Doering can perform sedentary work for the durational period. (Doc. 14, at 3).

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, we conclude that the ALJ's decision is supported by substantial evidence. Accordingly, we will affirm the decision of the Commissioner in this case.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  <u>See</u> 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in

this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial

14

evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
omitted). It means—and means only—"such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
(comparing the substantial-evidence standard to the deferential clearly-
erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that [she] is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512

F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status

of a claim requires the correct application of the law to the facts"); see also Wright

v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on

legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary

review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of

review. First, when conducting this review "we are mindful that we must not

substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d

607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir.

2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather

our task is to simply determine whether substantial evidence supported the ALJ's

findings. However, we must also ascertain whether the ALJ's decision meets the

burden of articulation demanded by the courts to enable informed judicial review.

Simply put, "this Court requires the ALJ to set forth the reasons for his decision."

<u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the

Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for
> his decision. 220 F.3d at 119. Conclusory statements . . . are
> insufficient. The ALJ must provide a "discussion of the evidence" and
> an "explanation of reasoning" for his conclusion sufficient to enable
> meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d
> 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ
> particular "magic" words: "<u>Burnett</u> does not require the ALJ to use
> particular language or adhere to a particular format in conducting his
> analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the

ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is

sufficiently articulated to permit meaningful judicial review.

16

**B.**     **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A)42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a)20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a)42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a)20

C.F.R. §§404.1520(a), 416.920(a).  Under this process, the ALJ must sequentially

determine: (1) whether the claimant is engaged in substantial gainful activity; (2)

whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals a listed impairment; (4) whether the claimant is able to

do his or her past relevant work; and (5) whether the claimant is able to do any other

work, considering his or her age, education, work experience and residual functional

capacity ("RFC").  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4)20 C.F.R.

§§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual

functional capacity (RFC). RFC is defined as "that which an individual is still able

to do despite the limitations caused by his or her impairment(s)." <u>Burnett</u>, 220 F.3d

at 121 (citations omitted); <u>see also</u> 20 C.F.R. §§404.1520(e), 404.1545(a)(1),

416.920(e), 416.945(a)(1)20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e),

416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's

medically determinable impairments, including any non-severe impairments

identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2),

416.945(a)(2)20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's

assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

18

set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.   20 C.F.R. §§404.1512(f), 416.912(f)20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have

followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination

20

based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington,</u> 174 F. App'x 6; <u>Cummings</u>, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. <u>Burns</u>, 312 F.3d 113; <u>see also</u> <u>Rathbun</u>, 2018 WL 1514383, at *6; <u>Metzger,</u> 2017 WL 1483328, at *5.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. <u>Id</u>. at 706-707. In addition, "[t]he ALJ must indicate in

his decision which evidence he has rejected and which he is relying on as the basis

for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir.

1999).

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

Doering filed this disability application in July of 2018, shortly after a

paradigm shift in the way medical opinions were evaluated when assessing Social

Security claims. Prior to March 2017, ALJs were required to follow regulations

which defined medical opinions narrowly and created a hierarchy of medical source

opinions with treating sources at the apex of this hierarchy. However, in March of

2017, the Commissioner's regulations governing medical opinions changed in a

number of fundamental ways. The range of opinions that ALJs were enjoined to

consider were broadened substantially, and the approach to evaluating opinions was

changed from a hierarchical form of review to a more holistic analysis. As one court

as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior

Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

> Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

24

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.   Substantial Evidence Supports the ALJ's Decision in this Case.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson v. Perales, 402 U.S. 389, 401 (1971), and "does not mean a large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but rather "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek v.

Berryhill, 139 S. Ct. 1148, 1154 (2019). Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that Doering was not entirely disabled.

Doering first argues the ALJ failed to find persuasive the opinion of Dr. Salotto, despite it being substantially corroborated by a Functional Capacity Evaluation performed upon Doering. Specifically, Doering claims the ALJ incorrectly evaluated Dr. Salotto's opinion under the new controlling regulations concerning an ALJ's evaluation of medical opinions. As we have noted, the ALJ did not find any medical opinion fully persuasive, and instead found that the opinion of the Consultative Examiner, Dr. Kneifati, was somewhat persuasive, while Dr. Salotto's opinion was deemed unpersuasive. Thus, to the extent the ALJ did not find the CE's report fully persuasive, the plaintiff contends that the ALJ substituted his own non-medical opinion for that of the medical evidence of-record.

In the instant case, we find that the ALJ properly adhered to the new regulatory scheme and his substantial evidence supports his determination. The ALJ discussed Dr. Salotto's opinion at length and the degree to which he found it unpersuasive. In finding the opinion unpersuasive, the ALJ discussed its supportability and consistency. (Tr. 23). He found Dr. Salotto's November 2019 medical statement unpersuasive because, although it was supported by references to

objective medical evidence, his rationale was not entirely consistent with this evidence. (Id.)

The ALJ discussed in detail how he reached this conclusion. (Id.) He cited Dr. Salotto's 2018 statement and noted several inconsistencies between it and Dr. Salotto's November 2019 statement. In 2018, Dr. Salotto discussed Doering's 2016 MRI, stated it did not indicate any changes that would require surgery and recommended conservative treatment. (Id.) Dr. Salotto physically examined Doering at that time and found antalgic gait assisted with a cane, a decreased sensation to pinprick in the left thigh and bother lower extremities, absent reflexes at his ankle and knees, and a decreased range of motion of his back. (Id.) Still, Doering's motor strength was equal and cranial nerves were intact. (Id.) The ALJ pointed out that, in September 2019, Dr. Salotto highlighted the MRI of Doering's lumbar spine showing several levels of deterioration and noted Doering had degenerative changes at adjacent levels as well. Despite this, Dr. Salotto did not note Doering had disc collapse "at all levels" even though he stated such in his November 2019 opinion. (Id.)

The ALJ further explained that while Dr. Salotto noted there were no changes that would require surgery at the time of his 2018 statement, this finding was inconsistent with other medical evidence. (Id.) The radiologist's interpretation of the

same MRI indicated only slightly progressive spondylotic changes with small disc bulges and protrusions, but no significant central canal stenosis. (Id.) The ALJ also cited that on physical exam, Doering had antalgic gait assisted with a cane, positive bilateral straight leg raising bilaterally, relatively decreased sensation in the right lower leg, and hypoactive reflexes at his knees and ankles. (Id.) However, Doering also had equal motor strength, intact cranial nerves, no lumbar tenderness to palpation, and there existed no notes of decreased lumbar range of motion. (Id.)

Moreover, the ALJ explained why he found Dr. Kneifati's opinion to be more consistent with the objective medical evidence as a whole. The ALJ found that Dr. Kneifati's opinion fell in between the two extremes of Dr. Nivus and Dr. Salotto, and further limited Doering to sedentary rather than light work. In sum, the ALJ discussed the consistency and supportability of Dr. Kneifati's opinion. He did so to explain how he determined the opinion's persuasiveness and his analysis was supported by evidence in the administrative record. Therefore, this analysis complied with the new regulatory scheme. Accordingly, we find that substantial evidence supports the ALJ's assessment of this opinion evidence.

Lastly, Doering argues the VE's testimony conflicts with the ALJ's RFC finding. The ALJ determined Doering had the RFC to perform sedentary work with certain postural limitations. However, according to Doering, the record evidence

establishes he has an RFC to perform less than sedentary work for the durational requirement.

Doering cites to SSR 96-8p, which states that the RFC is an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and that the finding must include a discussion of the individual's abilities on that basis. Doering claims that, under such standard and based on the VE testimony in response to certain hypotheticals, if Doering is off task for 15% of the day, is absent 1.5 days per month, needs to recline during the workday, or takes more than two 15-minute break and one 30-minute lunch break, he would be unemployable. Thus, he argues that this represents a direct conflict between the VE's testimony and the ALJ's hypothetical question posed to the VE concerning Doering's RFC.

We find that substantial evidence supports the ALJ's hypothetical question posed to the VE. It is well established that a hypothetical question given to a VE is not required to include limitations the ALJ finds are unsupported in the record. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Further, an ALJ is not obligated to credit a VE's testimony that is elicited in response to a hypothetical question that includes limitations the ALJ does not ultimately credit. Craigie v. Bowen, 835 F.2d 56, 57-58 (3d Cir. 1987).

Here, the ALJ posed several hypothetical questions to the vocational expert. Ultimately, the ALJ's hypothetical question accurately reflected the ALJ's RFC finding, which was supported by the record evidence. Based on the ALJ's hypothetical questions, the VE testified that Doering would be capable of performing a plethora of jobs in the national economy that fit the sedentary limitations of his RFC. The ALJ was under no obligation to include limitations he found were unsupported by the record.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical opinion evidence. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but

30

rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this opinion evidence or re-examining the hypotheticals posed to the vocational expert in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and recommend that this decision be affirmed.

C.      **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, IT IS ORDERED that the final

decision of the Commissioner denying these claims is AFFIRMED.


An appropriate order follows.


/s/ <u>*Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: March 7, 2022

32
